IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 29, 2009 Session

**STATE OF TENNESSEE v. CLOIS DEAN ASBURY**

**Direct Appeal from the Criminal Court for Campbell County**
**No. 13388      E. Shayne Sexton, Judge**

---

**No. E2008-01641-CCA-R3-CD - Filed April 30, 2010**

---

A Campbell County Criminal Court jury convicted the appellant, Clois Dean Asbury, of driving under the influence of an intoxicant (DUI), sixth offense, and violating the Tennessee implied consent law.  On appeal, the appellant contends that (1) there was insufficient evidence to convict him on either count because he was not specifically identified in court, and (2) the trial court's admission of the appellant's medical records, which revealed the appellant had a blood alcohol content level of 0.26 percent, violated his right to confront witnesses against him.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Michael G. Hatmaker, Jacksboro, Tennessee, for the appellant, Clois Dean Asbury.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William Paul Phillips, District Attorney General; and Latasha H. B. Wassom, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The record reveals that the appellant spent the night of October 19, 2005, with two friends, Kim and Tracy Wilson, at the Harrah's Cherokee Casino in North Carolina.  The

three left the Wilsons' home in Jacksboro for the casino around six or six-thirty in the evening, arrived at the casino around nine, spent a few hours gambling, left the casino, and arrived back at the Wilsons' home around three-thirty on the foggy morning of October 20.

Not long after they reached the Wilsons' house, the appellant began the short drive to his own home. On the way, the appellant's car collided with an oncoming vehicle. Both drivers were issued citations. The appellant was charged with DUI, his sixth, and refusing to submit to a blood test under the Tennessee implied consent law.

The appellant was tried before a Campbell County Jury on January 17, 2008. During voir dire, the trial judge identified the appellant by name and asked him to stand and face the jury pool, which the appellant did. Later, the State's prosecutor questioned the potential jurors. Notably, the Assistant District Attorney General said:

> One of the ways that we determine the levels of alcohol is we – the officers, when they're doing DUI investigations, ask for a person to submit to a blood or breath sample to determine their blood alcohol content. And that is something – do we all understand that's something we agree to when we get our license, that we will submit to it? However, the legislature has also set out that we can refuse to submit a sample, but there's a penalty for not submitting the sample and that's losing your license.
>
> *So, you're not gonna hear any evidence today that there was a blood or breath sample that we have a result or a number on. You're not gonna hear that because we don't have that.* Does everyone understand that you can use that as part of your evidence in determining? It's not a swaying – it's not for sure he's guilty – he didn't submit a sample – but it is a piece of evidence that you can use in making your determination as to the charges on guilt or innocence today. Does everyone understand that? Does anyone have a problem with that – think that we shouldn't be able to ask for a sample or have no right to ask for such a thing? No?

(Emphasis added).

At trial, the State first called Officer James Skeans, who was on patrol for the Jacksboro Police Department on October 20. Officer Skeans was nineteen years old on the night in question and had just recently joined the force after graduating from the academy. When Officer Skeans arrived at the scene of the accident, he found the two cars off the road, the occupants of one car on the ground next to it complaining of injuries, and the appellant near his vehicle leaning against a fence. After speaking to the occupants of the other car,

-2-

Officer Skeans turned his attention to the appellant. He testified that the appellant was unsteady on his feet, smelled of alcohol, and had slurred speech. The appellant's answers to some questions were unresponsive, and Officer Skeans had a hard time maintaining the appellant's attention. In general, Officer Skeans believed the appellant "wasn't quite all there." Additionally, Officer Skeans testified that the appellant admitted to having been drinking at a bar that night. Throughout this entire conversation, the appellant remained propped up against the fence.

Officer Skeans asked the appellant to take a field sobriety test, and the appellant agreed. As they walked to an area where the appellant could take the test, the appellant steadied himself on either the fence or his car the entire way. When Officer Skeans began demonstrating the test, the appellant laid down on the ground and said that he was suffering from a panic attack. With the appellant unable to complete the field sobriety test, Officer Skeans decided to cite the appellant for DUI. He read an implied consent form to the appellant and asked him to submit a blood or breath sample. The appellant refused, and he signed the form indicating his refusal. However, Officer Skeans erroneously checked the box indicating that the appellant refused to sign the form. At that point, the appellant was taken to St. Mary's Medical Center. Officer Skeans testified that he never obtained a sample from the appellant and that he did not request that the medical personnel attending the appellant extract a blood sample.

Kathy Hicks, the manager of the records department at St. Mary's Campbell County Hospital, testified that she had worked at the hospital for 36 years and, as the manager of the records department, her responsibilities included overseeing the department's daily operations and maintaining patients' records after discharge. She explained that while a patient is hospitalized, the records are kept at the nursing unit. However, upon discharge the record is taken to her department for filing and safekeeping.

Ms. Hicks produced a certified copy of the appellant's medical records from his October 20, 2005, admission. She explained that the records contained memoranda, reports, and notes related to the appellant's treatment; that the documents would have been created at or near the time of his treatment; and that they were created in the ordinary course of the hospital's activities. The appellant objected, arguing that the admission would violate the appellant's constitutional rights to confront witnesses against him. The trial court overruled the objection and admitted portions of the medical report. However, the court limited Ms. Hicks' testimony about the document to only reciting what the report said; it prohibited questions calling for Ms. Hicks to interpret the information contained in the report. In addition, the court specifically noted that the appellant could have subpoenaed the professionals who actually prepared the reports but did not.

The report contained several references to a blood test conducted by the hospital, which indicated that the appellant's blood alcohol level was 0.26 percent. In the discharge diagnosis, the report stated, "Positive alcohol in the blood." In addition, on one portion of the report there were several boxes checked, such as "Well developed, well nourished," and "No acute pain/distress," but directly under those lines, the line for "No odor ETOH" is circled rather than checked. Lastly, the report listed the results of a urine drug screen as being positive for benzodiazepines.[1]

At the conclusion of Ms. Hicks' testimony, the State rested its case. There was no testimony at trial as to the meaning of any of the statements in the report, nor was there any testimony as to how or why the tests were conducted. In addition, none of the State's witnesses explicitly identified the appellant as the man at the scene of the accident or the man admitted into St. Mary's.

The defense then called four witnesses. The first, Molly Laws, testified that she met the appellant approximately two months before trial when she went to his car lot to look for a car. Ms. Laws said that the appellant "seemed familiar," and she asked if he had been in an accident two years earlier. She explained that, on October 20, 2005, she was driving on the same street and was passed by the other car involved in the accident. Ms. Laws stated that the car "flew past" her and that shortly thereafter she encountered the scene of the accident. As she approached, she witnessed someone get out of the car that passed her. The person had a brown paper bag in his hand, and he left the scene. In addition, Ms. Laws testified that the driver of the car that passed her got out and began yelling at the appellant. Ms. Laws testified that the appellant was calm, appeared concerned about the other people in the accident, and did not appear intoxicated. Ms. Laws left the scene once she determined that no one needed immediate medical attention. She was not there when the police arrived.

The defense then called Tracy Wilson. She testified that she had been friends with the appellant for eighteen years and that they were together from around 6:00 p.m. on October 19 until just before the accident. She and her husband drove with the appellant to the casino in North Carolina and returned around 3:00 or 3:30 a.m. on October 20. She testified that the casino did not serve alcohol, that the appellant did not drink on the way, and that she did not see the appellant consume any alcohol that night. She further testified that the appellant was sober when he left her house minutes before the accident.

---

[1] According to the United States Drug Enforcement Agency, benzodiazepines are a family of depressants that are used therapeutically in the United States to, among other things, treat anxiety. Several members of this family of drugs are available in the United States under a prescription. See U.S. Department of Justice, U.S. Drug Enforcement  Agency, Drugs of Abuse at 41 (2005) available at: http://www.usdoj.gov/dea/pubs/abuse/abuse/doa-p.pdf (Last visited Mar. 30, 2010).

Next, the defense called the appellant's step-son, Brent Richardson. He arrived at the scene of the accident after the police. Mr. Richardson testified that he saw his mother and the appellant talking to each other, as well as speaking with the police. He further testified that the appellant did not appear intoxicated and that he did not smell alcohol on the appellant. In addition, he noted that the appellant had a history of medical problems, including high blood pressure, "bad nerves," and heart issues.

Finally, the defense called the appellant's wife, Patricia Asbury. Like Mr. Richardson, Ms. Asbury arrived at the scene after the police. She testified that the appellant appeared normal and that he was able to stand without having to prop himself up. Also like Mr. Richardson, she did not detect alcohol on the appellant's breath and did not think the appellant was in any way impaired on the night of the accident. She further noted that the appellant had a history of medical issues. The appellant's counsel also elicited the following testimony:

> Q. The way he's sitting here today and his face appears to be extremely red, is that a normal way he appears?
> A. Yes, cause he had high blood pressure.
> Q. Is there any normal way that the whites of his eyes appear on a normal day, kind of like he is – does he look normal right now?
> A. Yeah.

The defense rested and the trial court gave its instructions to the jury prior to the parties giving their closing arguments. Of particular note, the trial court instructed the jury that it had to find that the appellant's identity had been established beyond a reasonable doubt.

In its closing, the State relied heavily on the medical report as evidence of the appellant's intoxication. It argued that the medical report impeached the defense's witnesses. At least twice during its closing argument, the State made specific comments about the report:

> Now, there has been testimony here today from family members and friends of [the appellant], and I – I'm sure they have very good intentions of coming in here, but I want you to think about what Ms. Wilson testified to. That she had been – she's the one that had been with him at Harrah's earlier in the night and that there's no alcohol at Harrah's, they had not had any alcohol that night, no alcohol whatsoever. [The appellant] tells Deputy Skeans well, he had had some. He don't tell him how much, but had – tells him he had some and he'd been at a bar.

And I also want you to take into consideration the medical records that you have in your possession that was introduced. There was alcohol somewhere that night. Somewhere, somebody got a hold of alcohol. It's there. You can look at it and you can see it. There's no denying that. There wasn't – there's not the argument that it wasn't consumed. It was consumed; it's there. Look at your medical records.

. . . .

Now, [defense counsel] wants you to think that while [the appellant is] in the care of EMT that [the appellant] over here has gotten injected with something to cause him to have a positive alcohol result at the hospital when they do their lab reports. I would submit to you that the EMT may inject you with something, but it's not alcohol. If you'll look at your medical reports, you'll see several places where it says positive alcohol, positive for alcohol. He had consumed alcohol that night.

The jury found the appellant guilty on both counts.

The appellant renewed his objection to the admission of his medical records at the motion for a new trial hearing. The trial court heard the motion on June 23, 2008, and the parties expanded on the same arguments they made at trial. The appellant also argued at the hearing that the State failed to submit sufficient evidence from which the jury could identify the defendant as the person involved in the events of October 20. The appellant raises the same arguments on appeal.

## II. Analysis

### A. Identification at Trial

The appellant's first argument, that the State failed to properly identify him as the person driving the vehicle on October 20, raises a question regarding the sufficiency of the evidence. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual

issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In this case, the appellant argues that because none of the State's witnesses identified him in court, it automatically failed to meet its burden. We are not persuaded.

"The identity of the defendant[] is a question of fact solely for the jury." State v. Phillips, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986); see also State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982). That is precisely what the trial court instructed the jury. Furthermore, circumstantial evidence of a defendant's identity is sufficient. See State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). However, when the State relies on circumstantial evidence alone, "the facts must be so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defedant alone." Id. (quotation marks and brackets omitted).

In this case, there was more than sufficient evidence from which the jury could conclude that the appellant was the person involved in the accident on October 20. First, Officer Skeans testified that he personally interviewed the appellant at the scene of the accident. He repeatedly referred to the appellant by name. The appellant's counsel also specifically referred to "this man," the appellant, during her cross examination of Officer Skeans. Second, Officer Skeans testified that the person he encountered at the scene was taken to St. Mary's Hospital for evaluation. Saint Mary's Hospital produced the medical records for Clois Dean Asbury showing he was admitted that morning. Members of the appellant's family testified that they met with him at the hospital after the accident. Third, the colloquy between counsel and the appellant's wife also specifically referred to the appellant's appearance at the defense table compared to his appearance on the night in question. Throughout this testimony, the appellant never raised the issue of identity to the trial court or the jury. Indeed, he did not even do so when the trial judge had the defendant stand and identified him as "Clois Dean Asbury" during voir dire. While the appellant is correct that it is a wise practice for the State to have its witnesses identify the defendant in court as the person they encountered, if possible, it is not necessary. Circumstantial evidence is sufficient. We conclude that there was sufficient evidence of the appellant's identity in this case.

**B. Admissibility of Medical Records**

The appellant contends that the admission of his medical records into evidence violated his right to confront witnesses against him because the information contained in the records was provided by individuals who did not testify. As a general rule, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court." State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007); see also State v. Gilley, 297 S.W.3d 739, 759-60 (Tenn. Crim. App. 2008). However, the determination of whether the admission of a hearsay statement violated a defendant's rights under the Confrontation Clause "is purely a question of law." Id. Thus, appellate review of that question is de novo. Id. at 142.

## 1. Confrontation Clause Analysis

The Sixth Amendment to the United States Constitution, which is applicable to the States, see Pointer v. Texas, 380 U.S. 400, 403-06, 85 S. Ct. 1065, 1067-69 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," and Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face." Although these two provisions do not have identical wording–and in fact our State provision creates a somewhat stronger right–our courts traditionally apply the same standards enunciated by the United States Supreme Court in determining the scope of both clauses. See State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008).

It is an understatement to say the case law construing these two provisions has been in flux since Crawford v. Washington, 541 U.S. 36 (2004). The traditional analysis of the federal clause described in Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531 (1980), has been "dramatically altered" in recent years. Cannon, 254 S.W.3d at 301 (citing Crawford, 541 U.S. 36). That lead to a series of cases in both the United States Supreme Court and our supreme court adjusting the analytical framework. See, e.g., Melendez-Diaz v. Massachusetts, __ U.S. __, 129 S. Ct. 2527 (2009); Davis v. Washington, 547 U.S. 813, (2006); Cannon, 254 S.W.3d 287; Lewis, 235 S.W.3d 136; State v. Maclin, 183 S.W.3d 335 (Tenn. 2006). The dust appears to have settled, however, and our supreme court has summarized the analytical approach Tennessee courts are to apply:

> [u]nder both the United States and the Tennessee Constitutions, the appropriate analysis for determining whether an out-of-court statement may be admitted into evidence without violating an accused's right of confrontation is as follows. A court must first determine whether the statement is testimonial or nontestimonial. Statements are testimonial if the primary purpose of the statement is to establish or prove past events potentially relevant to later criminal prosecutions. A testimonial statement is inadmissible unless the State can establish that: (1) the declarant is unavailable and (2) the accused had a

prior opportunity to cross-examine the declarant. If the statement is nontestimonial, the Confrontation Clause does not apply, and the statement must be analyzed under the traditional limitations upon hearsay evidence.

Cannon, 254 S.W.3d at 303 (quotation marks and citations omitted). As Cannon makes clear, the old Roberts analysis no longer applies even to nontestimonial hearsay. Id. (quoting Lewis, 235 S.W.3d at 145).

We begin our analysis with the "threshold question" of whether the statement is testimonial or nontestimonial. Id. at 301. As instructed by Davis, our determination is based on the statement's "primary purpose," 547 U.S. at 822; see also Cannon, 254 S.W.3d at 302-03, and is guided by the United States Supreme Court's articulation of the three core formulations of testimonial statements:

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Melendez-Diaz, 129 S. Ct. at 2531 (quoting Crawford, 541 U.S. at 51-52) (ellipses omitted).

The medical records at issue in this case are nontestimonial under the primary purpose analysis. First, they do not fit into any of the core formulations listed in Crawford. Indeed, the United States Supreme Court has specifically stated that medical records created for treatment purposes are nontestimonial. Melendez-Diaz, 129 S. Ct. at 2533 n.2. That decision is in accord with several Tennessee cases that hold medical records produced for the purpose of treatment are nontestimonial.[2] Second, Ms. Hicks testified that the records were

_____

[2] See, e.g., Cannon, 254 S.W.3d at 303 (holding that "statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial"); State v. Jacqueline P. Warlick, No. M2005-01477-CCA-R3-CD, 2007 WL 1439648, at *5-8 (Tenn. Crim. App. at Nashville, May 17, 2007); State v. Willie R. Harris, No. M2005-00241-CCA-R3-CD, 2006 WL 407779, at *3 (Tenn. Crim. App. at Nashville, Feb. 21, 2006); State v. Jimmy Gene Blankenship, No. E2001-01372-CCA-R3-CD, 2003 WL 1892712, at *10-13 (Tenn. Crim. App. at Knoxville, Apr. 17, 2003); State v. Donald W. Branch, No. W1999-00506-CCA-R3-CD, 2002 WL 1558485, at *12-14 (Tenn. Crim. App. at Jackson, Jan. 4, 2002); accord State v. Goldston, 29 S.W.3d 537, 540-42 (Tenn. Crim. App. 1999); State v. William Roy Hopper,

(continued...)

created and maintained in the regular course of the hospital's business by the healthcare providers treating the appellant. As discussed below, Ms. Hicks' testimony also established that the records meet the business records exception to the prohibition on hearsay, which the Tennessee Supreme Court has stated means it is "properly categorized as nontestimonial." Cannon, 254 S.W.3d at 303. Third, there is absolutely no testimony in the record indicating that the testing reflected in the records was conducted for any reason other than to assist in the treatment of the panic attack the appellant claimed he suffered during the field sobriety test. Indeed, Officer Skeans testified that he never sought any testing from the medical personnel treating the appellant. It is not clear Officer Skeans even went to the hospital. In other words, there is no reason to suspect the records are anything other than what they purport to be: records prepared by medical professionals to aid in appellant's treatment while he was at St. Mary's on October 20 and 21. They were not primarily prepared for subsequent litigation. Thus, the medical records are nontestimonial hearsay and are not subject to Confrontation Clause scrutiny.

Our conclusion that the medical records in this case were compiled—and the blood work reflected in the records was conducted—primarily for the purposes of providing the appellant medical treatment is bolstered by our decision in State v. Jimmy Gene Blankenship, No. E2001-01372-CCA-R3-CD, 2003 WL 1892712 (Tenn. Crim. App. at Knoxville, Apr. 17, 2003). In that case, although there was testimony from some of the medical personnel concerning the tests (which is absent here), there was conflicting testimony about whether the tests were conducted at the behest of law enforcement. Id. at *11-12. The court was persuaded that the tests were conducted primarily for medical treatment purposes, rather than law enforcement purposes, because the officers involved in the investigation all testified that they did not request the blood work. Id. at *12. The lack of evidence that law enforcement requested the tests was sufficient for the court to conclude that the tests were for medical purposes. Id. As described above, the same is true here.

The appellant's first argument on this issue is that the records do not satisfy the three-part test outlined in State v. Henderson, 554 S.W.2d 117 (Tenn. 1977). To the extent Henderson has any precedential value at this point, its discussion of the Confrontation Clause analysis is outdated in light of the changes in the case law described above. The appellant's heavy reliance on Henderson is, therefore, misplaced.

The thrust of the appellant's argument is that there is no way to determine the primary purpose of the records because there was no testimony from the medical professionals who ordered the tests. The only testimony in this case was that the records were prepared in the

_____

[2](...continued)
No. 02C01-9612-CC-00485, 1998 WL 17635, at *2-4 (Tenn. Crim. App. at Jackson, Jan. 20, 1998).

-10-

ordinary course of business and that Officer Skeans did not request that the tests be performed. Because the hospital is in the business of providing medical care to its patients–unlike the law enforcement laboratories from which many tests results are introduced into evidence–it is safe to presume that its personnel were doing precisely that in this instance. While that presumption could have been rebutted by the appellant, he did not do so. He did not call the doctors who ordered the tests. He did not call the individuals who withdrew the samples. He did not call the technicians who conducted the tests or recorded their results. In short, he did not call anyone who contributed to the records at all, nor did he take the stand himself to describe the circumstances under which the samples were taken. Thus, as was the case in Warlick, "no proof was presented [in the trial court] contesting the trustworthiness of the reports or . . . whether the evidence satisfied the requirements of the business records exception." No. M2005-01477-CCA-R3-CD, 2007 WL 1439648, at *6.[3]

## 2. Nontestimonial Hearsay Analysis

Because the medical records are nontestimonial, the next step in our inquiry is to evaluate their admissibility in light of Tennessee's limitations on the use of hearsay evidence. See Cannon, 254 S.W.3d at 303. Although the records are undeniably hearsay and are thus inadmissible unless they satisfy an exception to the hearsay rule, see Tenn. R. Evid. 802, we nevertheless conclude that they are admissible as business records, see id. at 803(6).

Tennessee Rule of Evidence 803(6) provides that records of regularly conducted activities are not excluded under the hearsay rule. The following are considered records of regularly conducted activities:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the

---

[3] The appellant maintains that it was inappropriate for the State to rely upon the Warlick decision without informing the trial court that the decision was unpublished. This argument misses the mark. First, the appellant informed the trial court that the Warlick decision was unpublished during the hearing on the motion for a new trial, and the trial court specifically stated that it would review the case anyway. Second, the record reveals that the State offered copies of the case during the hearing. Third, the Warlick decision accurately reflects the state of the law, which is arguably not something that can be said for Henderson, upon which the appellant relied during the hearing.

source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

The appellant's medical records in this case satisfy the exception in Rule 803(6). The records contain memoranda, reports, records, and data compilations which, according to Ms. Hicks, were made at or near the time of the appellant's treatment and were based on information from people with knowledge of their contents (*i.e.*, the appellant's healthcare providers). Pursuant to Tennessee's Hospital Records as Evidence Act, Tenn. Code Ann. §§ 68-11-401 *et seq.*, and the Medical Records Act of 1974, Tenn. Code Ann. §§ 68-11-301 *et seq.*, the appellant's healthcare providers were under a duty to maintain these records. Finally, Ms. Hicks' testimony established that these records were created and maintained in accordance with St. Mary's Hospital's regular business. Thus, so long as there is no indication that the records lack trustworthiness, they are not excluded under the hearsay rule.

That is the gravamen of the appellant's argument. Essentially, the appellant argues that because the State did not provide testimony as to how and why the tests, whose results are reflected in the records, were conducted, the records lack sufficient trustworthiness to satisfy Rule 803(6).[4] However, the exception is designed to allow the admission of reliable hearsay evidence without testimony from the declarant. Rule 803(6) codifies the general consensus that records maintained in the ordinary course of business are typically trustworthy enough to justify suspension of the rule prohibiting hearsay evidence. Indeed, as the commentary to the rule makes clear, the testimony of a records keeper is unnecessary; the records can be admitted with a certification under Rule 902(11). See Tenn. R. Evid. 803(6), Advisory Comm'n Cmts (2001). To read the phrase "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness" to require testimony from the declarant would virtually obliterate the exception. The State need not produce more evidence of the trustworthiness of the records unless the defense produces evidence calling it into question. As already noted, the appellant did not do so in this case. Consequently, these records satisfy the exception in 803(6).

---

[4] The appellant takes this argument a step further, saying that because the State did not provide testimony about how and why the tests were conducted, admission of the records violates the appellant's constitutional right to confrontation. That argument muddles the analytical process by having us return to the Confrontation Clause analysis to decide the applicability of the hearsay exception in Rule 803(6). That is not how the analysis works. As detailed above, the records are not testimonial statements and are therefore not restricted by the appellant's confrontation rights.

The conclusion that the medical records in this case are properly admitted under Rule 803(6) is strengthened by the admission of the records in State v. Goldston, 29 S.W.3d 537 (Tenn. Crim. App. 1999). In Goldston, there were two sets of records at issue. Id. at 541. For one set, the State elicited testimony from both the records keeper at the hospital as well as the medical professionals who helped create it. Id. The other set was from a different hospital, and for that set the State only elicited testimony from a records keeper. Id. The testimony from the second records clerk was nearly identical to Ms. Hicks' testimony with respect to the fact that the documents were prepared and maintained by hospital personnel in the ordinary course of business. Id. This court concluded that the admission of *both* sets of records was proper because both sets satisfied the business records exception. Id. at 541-42. We see no meaningful distinction between Goldston and the present case with respect to the hearsay issue. The trial court did not err in admitting the records under 803(6).

### 3. Search and Seizure

The appellant's last argument is that because he refused to consent to the blood test requested by Officer Skeans under Tennessee's implied consent law, the hospital's withdrawal of a blood sample constituted an unreasonable search under the Fourth Amendment to the United States Constitution.

Again, we are not persuaded. Initially, we note that the appellant waived this argument by not raising it in the trial court, during either the trial or the motion for a new trial. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995). Second, while Officer Skeans' request was made pursuant to section 55-10-406(4)(a) of the Tennessee Code Annotated, the tests conducted at the hospital do not fall under that provision. Section 55-10-406 "has no applicability to procedures performed pursuant to a medical rather than a law enforcement request." Goldston, 29 S.W.3d at 540 (quoting State v. Ridge, 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982)) (quotation marks omitted). Third, nothing in the record indicates the tests performed on the appellant were conducted at the behest of law enforcement. See State v. John William McCoy, No. 9, 1991 WL 35749, at *2 (Tenn. Crim. App. at Jackson, Mar. 20, 1991) (noting that the Fourth Amendment has no application to the acquisition of blood samples taken in the course of medical treatment if there is no state action to cause the sample to be taken). Finally, nothing in the record suggests the appellant objected to the blood test at the time. The tests did not violate the appellant's Fourth Amendment rights.

The appellant's reliance on Georgia v. Randolph, 547 U.S. 103, (2006), is misplaced. In that case, the United States Supreme Court held that a physical search of the defendant's home, revealing evidence of cocaine possession, was unreasonable where the police, who went to the home with the defendant's estranged wife to retrieve her daughter, were expressly

denied permission to search the home by the defendant but nevertheless entered upon consent from the wife. Id. at 106-07. The Court held that, under those circumstances, the police could not search the home based on the wife's consent in the face of the defendant's refusal. Id. at 122-23. Randolph does not address the seizure of a laboratory specimen, nor does it address the distinction between blood tests conducted for law enforcement purposes and those conducted for medical purposes. Regardless, the only evidence in this case is that the appellant refused the test requested by Officer Skeans. The record does not indicate he refused testing by the hospital. Moreover, the evidence in the case indicates that law enforcement did not seek a test from the hospital. In short, nothing suggests the blood tests in this case violated the appellant's Fourth Amendment rights.

### III. Conclusion

The statements contained in the appellant's medical records are nontestimonial and therefore not subject to Confrontation Clause restrictions. While the records contain hearsay evidence, the records satisfy Rule 803(6)'s exception to the prohibition on hearsay evidence. Accordingly, the trial court did not err in admitting the records. Additionally, the evidence is sufficient to support the appellant's convictions. The judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE